# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs January 25, 2011

## STATE OF TENNESSEE v. JIM FREDERICK HEGEL

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S54,351     R. Jerry Beck, Judge**

**No. E2010-00747-CCA-R3-CD - Filed July 27, 2011**

A Sullivan County Criminal Court jury convicted the appellant, Jim Frederick Hegel, of rape of a child and incest. After a sentencing hearing, the trial court ordered that he serve consecutive sentences of nineteen and three years, respectively. On appeal, the appellant contends that (1) the evidence is insufficient to support the convictions, (2) the prosecutor made improper comments during voir dire about the victim's testimony and credibility that may have biased the jury against the appellant, and (3) the trial court improperly ordered consecutive sentencing. Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Steve McEwen (on appeal), Mountain City, Tennessee, Andrew J. Gibbons (on appeal), Blountville, Tennessee, and Randall D. Fleming (at trial), Kingsport, Tennessee, for the appellant, Jim Frederick Hegel.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; H. Greeley Welles, Jr., District Attorney General; and Julie R. Canter and Amber D. Massengill, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

This case relates to the appellant's sexual abuse of his stepson. The record reflects

that in June 2009, the appellant was charged by presentment with two counts of rape of a child, a Class A felony; two counts of aggravated sexual battery, a Class B felony; and one count of incest, a Class C felony. According to the presentments, the crimes happened on or about November 28, 2002, to December 31, 2002.

At trial, Officer Scott Edward Denney of the Kingsport Police Department testified that on June 6, 2007, the victim's mother and the victim walked into the police department and reported that the victim had been sexually abused. Officer Denney took a report and sent the report to the Detective Division.

The then twelve-year-old victim testified that he was born on March 5, 1997, and that he knew the difference between the truth and a lie. In November and December 2002, the victim lived in an apartment in Tennessee with his mother and the appellant. The victim said the abuse started when the appellant told him that the victim's mother would not have sex with the appellant and that the appellant wanted to have sex with the victim. The victim said that the appellant "put his wiener up my butt and stuff, and made me rub his wiener and squeeze it and stuff," that the appellant "tried to make white suff come out of his wiener . . . and stick it in my mouth," and that the appellant touched the victim's penis. The victim said that the appellant also "stuck his finger up my butt" and that the appellant's finger and penis were "really big and it really hurt." When asked what time of year the incidents occurred, the victim said, "Christmas I was four, around there. Yeah, four." The State asked the victim if the abuse also happened when he was five years old, and the victim said, "It was — in Christmas it was when I was four, when I was five." The victim acknowledged that the abuse happened near Thanksgiving and Christmas in 2002.

The victim testified that the abuse occurred in the bathroom after his mother went to bed. The appellant promised the victim money in exchange for the sexual acts and told the victim not to tell the victim's mother. The State asked the victim how often the abuse occurred, and the victim said, "It started with four at a day and then keep going, keep doing four, four, four, four at a day. . . . It was four things a day. It was my daily routine." He said the abuse continued until his mother left the appellant. The victim acknowledged that he had been in three mental hospitals, that he lied to the doctors and nurses at the hospitals, and that he lied to them in order to get his way and get what he wanted. The victim said that he began having nightmares when the abuse started, that he was still having nightmares, and that "I can't control it."

On cross-examination, the victim testified that his nickname was "Moose," and he acknowledged speaking with Detective Melanie Adkins in July and October 2007. He said he did not remember telling her that the abuse occurred in North Carolina or that the appellant raped him only twice with the appellant's penis and once with the appellant's

finger. He acknowledged that he told Detective Adkins the bathtub in the family's Tennessee apartment had a rail and that the appellant's penis was soft. However, he explained that the appellant's penis "switches, soft and hard. He can move it when it's soft and then start pulling it up." He acknowledged telling Detective Adkins that the appellant "sat still and didn't move" during the abuse, but he testified, "He sat still, and then he put me on him with his wiener straight out." He acknowledged that he told Detective Adkins about a camping trip in Tennessee with the appellant. The victim said that he got "full of mud" during the trip and that the appellant had to clean him. He also acknowledged that he told Detective Adkins the appellant threatened to shoot him if he revealed the abuse and that he did not tell her the appellant did "four things" to him everyday. He said he did not tell her because "I didn't — I — I didn't 'member it. I have to 'member things."

The victim testified that the abuse started when he was in the first grade and that it "[m]ade me a miserable life." He said Camelot was the last mental hospital he was in, that he learned to tell the truth while he was in Camelot, and that he lied previously because "I was too afraid to tell the truth when I was little. Really I feel like I still am." He said that someone caught him engaged in a sexual act with another boy and that his mother found out about the act. He stated, "And that's when my mom figured out who taught [me]." He denied that he accused the appellant of sexually abusing him in order to get out of trouble over the incident with the boy, and he acknowledged that his mother and the prosecutor helped him prepare to testify.

Detective Melanie Ann Adkins of the Kingsport Police Department testified that she primarily worked with child abuse cases. On July 12, 13, and 17, 2007, the victim placed recorded telephone calls from Tennessee to the appellant in North Carolina. Detective Adkins and the victim's mother were present during the calls. Later, Detective Adkins sent the recorded calls to the Regional Organized Crime Information Center (ROCIC) for removal of background noise and voice enhancement.

On cross-examination, Detective Adkins testified that she and the victim's mother did not coach the victim about what to say to the appellant but that the detective told the victim to talk with the appellant "about the specific acts that were done to him." She acknowledged that the appellant denied the abuse in the recorded conversations. She said that when she first met the victim and his mother, the victim's mother mentioned that the victim was experiencing rectal bleeding. The victim talked about the bleeding with the appellant during one of the recorded calls. Detective Adkins acknowledged that the victim's rectal bleeding occurred five years after the alleged abuse.

Joshua Brice Carder, who worked as an audio-video forensic analyst for the ROCIC in 2008, testified that he reviewed the original telephone recordings in this case and clarified

the audio on the recordings. He said he did not alter the voices on the recordings but made the voices more intelligible. The State played the victim's second recorded conversation with the appellant, which occurred on July 13, 2007, for the jury. According to our review of the conversation, the victim and the appellant stated, in pertinent part, the following:

Victim: Uh, I don't know why, but I think . . . I don't know why but my butt's been bleeding a lot and it's not cause, uh, I'm pressing down hard, cause every time I do it it's easy.

. . . .

Appellant: Daddy's going through the same thing too, but its just a little bit ah . . . it's ah . . . it's just a lot of green stuff like that. Okay?

Victim: Yeah.

Appellant: Um I had that ugh stop after about 2, 3 weeks.

Victim: Okay.

Appellant: Okay?

Victim: I thought it was cause of something else.

Appellant: No, we never did anything like that. You keep that quiet, okay?

Victim: Okay.

. . . .

Appellant: Okay. All right. It sounds like you have what's called a hemorrhoid, [victim].

Victim: I thought it was cause of something gross you did to me a long time ago.

Appellant: No, no, no, no, no, no.

-4-

Victim:      I thought it was because you stuck your finger up my butt.

Appellant:   No, I did not!

Victim:      Oh, well you did.

Appellant:   Well, no we don't.  We didn't do that.  Forget about that.

Victim:      Okay, I'll try.

Appellant:   Okay.  But, no, there's nothing there.  It's called a hemorrhoid.

Victim:      But, do you remember anyways?

Appellant:   [Victim], I've (inaudible) a long time ago until you bring it up.  (inaudible)

Victim:      I thought that was the reason why.

Appellant:   No, it was by mistake.

. . . .

Victim:      What if the doctor knows?  What if he finds out that . . .

Appellant:   He won't unless you say something.

. . . .

Victim:      Okay.

Appellant:   But no, but, but as far as that, no we never stuck fingers up butt or nothing like that.  One time I did it by mistake trying to help you wipe your hinny right.  That was it.

Victim:      I forgot.

. . . .

Appellant:   Forget about all that stuff.  All right?  I did that one time trying to help you wipe your hinny.  Remember right, that's what happened?

Victim:      Okay.

Appellant:   It didn't go up in there.

Victim:      And probably the doctor can't tell anyways.

Appellant:   No.

Victim:      That you did that.

Appellant:   I did, I did it by mistake.

. . . .

Victim:      Okay.  Well I wanna, I want to tell you something.  Will the doctor be able to know that you did that . . . and stuff?

Appellant:   [Victim]!  Stop asking that!  No!

Victim:      Okay.

Appellant:   I didn't do anything.

Victim:      Okay.

Appellant:   Okay?  Put that out of your head.  Forget it ever even happened.

On cross-examination, Carder testified that he could hear voices whispering on the recording.  He said the purpose of enhancing the recording was to make "[a]ny voices we hear on there . . . audible."

Connie McReynolds testified that she was the Office Manager for Tuscany Villas, formerly the Cabana Apartments, in Kingsport. According to the apartment complex's records, the appellant leased an apartment from October 2000 to September 2003. On cross-examination, McReynolds testified that only the appellant's name was on the lease.

Detective Jennifer Lynn Rhoades of the Wilmington Police Department in Wilmington, North Carolina, testified that in October 2007, Detective Adkins contacted her, trying to find the appellant. On the afternoon of October 19, 2007, Detective Adkins arrived in Wilmington, and Detective Rhodes took her to the appellant's residence. A young man answered the door and identified himself as the appellant's nephew. The appellant was not home, so Detective Adkins left her business card. Then Detective Rhoades and Detective Adkins went to the appellant's place of employment. Detective Adkins met with the appellant and advised him of his rights. The appellant voluntarily spoke with Detective Adkins, gave a written statement, and signed the statement.

On cross-examination, Detective Rhodes testified that she did not remember the appellant's mentioning an attorney. Detective Adkins asked the appellant questions and wrote the appellant's statement for him as he gave it. Detective Rhodes said she did not remember if she or Detective Adkins asked the appellant if the statement was true and accurate before he signed it.

The victim's mother testified that she married the appellant in April 2002, that they lived in the Cabana Apartments, and that she divorced the appellant in 2006 or 2007. She was present during the victim's recorded telephone calls to the appellant, and she did not tell the victim what to say. However, she told him to keep talking with the appellant. She said that the bathtub in the family's apartment had a rail, explaining, "We had the glass sliding doors on the bathtub. And at one point they eventually took the doors down, but they left that stupid metal bar on the bottom of the tub." She said the appellant had erectile dysfunction during their entire marriage but that his penis could become erect.

On cross-examination, the victim's mother testified that the victim was "scared to death" to telephone the appellant for the recorded calls and that she and Detective Adkins told the victim not to be afraid and to talk with the appellant "like normal." She said that the victim had "sporadic" rectal bleeding and that he saw Dr. Roger Archer for a rectal exam. She said, "Sometimes he eats too much foods that would require more juice; and sometimes he doesn't." She said the bleeding "[c]ould be due to constipation; it could be due to a lot of things." She said she found out about the abuse when a neighbor caught the victim and another boy "in a not-so-appropriate act." The neighbor told her about it, and she confronted the victim. She said the victim did not lie about what he had done but claimed he "saw it in a movie." She said that she did not have cable television in her home and that she told the

victim she did not believe him. She stated, "And then he broke down in tears and he said, 'Daddy.'" She said that the victim did not start acting out and lying until he revealed the abuse when nine or ten years old. Prior to that, the victim had been treated for attention deficit hyperactivity disorder (ADHD) and oppositional defiant disorder. She said she did not think the victim lied more than any other child, but she acknowledged that the victim lied previously and lied while he was in the hospital. However, she said the victim's lying had "gotten better." She said that the victim began having night terrors when he was about four years old and that the appellant lived with them at that time. She said the victim did not have rectal bleeding in 2002 or 2003. On redirect examination, she acknowledged that the victim never changed his story about the abuse.

The State recalled Detective Adkins. Detective Adkins testified that she met with the appellant in Wilmington, North Carolina, on October 19, 2007, and that the appellant was not in custody. She said she explained the victim's allegations to the appellant and that he gave a statement. She read the appellant's written statement to the jury. The statement provides, in relevant part, as follows:

> I have only put my penis in Moose's . . . butt one time. It was when we lived at Cabana Apts in Kingsport. I think it was in 2002, when Moose was 5 or 6 years old, probably in [k]indergarten. . . . The time I put my penis in Moose's butt was probably winter time because I soak in the bathtub in winter & I shower in the summer & warm weather. It had to be between the middle of 2001 & [Aug.] 8, 2003 because [that's] when we lived there. [The victim's mother] & I had gotten into an argument & I had been drinking. I drank often in Tennessee. I got in the bathtub to soak & [the victim] got in there with me. I have [e]rectile dysfunction & I've had it since I was 25 yrs old. I'm 38 now. I haven't been able to ejaculate in many years. . . . The warm water & him moving around made my penis start to get hard. It was so unusual for that to happen, it just felt good. I didn't plan on it, but with [the victim] sitting on my lap & my penis getting hard, I put it in his butt. [The victim] started moving around [on] my penis but I didn't put it all the way in. I only put it in part of the way & it didn't last any more than a minute – probably only 30 seconds. I realized it wasn't right so I stopped. . . .
>
> There was one time I put my finger in [the victim's] butt. . . . Moose had been there at the campground & was filthy. I

took him home and scrubbed him but I wasn't in the tub. It was
[summer] right before we moved to N.C[.] (Summer, 2003).
[The victim's] butt was raw so I stuck my finger in his butt to
[c]lean him. My finger barely went in to the first digit if that
far. It hurt him because his butt was raw. When I put my penis
in [the victim's butt], it did not bleed. He said, "Oh" like it hurt,
but he didn't cry or anything. When my finger went in his butt,
it was only like the nail part to clean him. I love [the victim]
like a dad & I am not sexually attracted to him.

On cross-examination, Detective Adkins acknowledged that she wrote the statement as the appellant talked. She also acknowledged that "butt" and "anus" had different meanings and that "anus" and "penetrate" were not in the appellant's statement. She said she used the word "butt" during the appellant's interview and that the appellant and the victim also used the word. She said, however, that she believed the victim was referring to his anus and that the appellant indicated penetration had occurred. She said that the victim alleged many more acts than the appellant admitted and that the appellant denied everything except what was in his statement. She acknowledged that the appellant gave the statement while they were in a room at his place of employment and that at least two people came into the room during the interview. She said that one person came into the room while she was reading Miranda warnings to the appellant and that she stopped talking while the person was in the room. She said that the appellant reviewed his statement, that he made changes, and that he had the opportunity to add anything he wanted. The appellant chose not to add anything to the statement. She acknowledged that the victim told her about the camping trip and that the victim's story corroborated the appellant's account. After Detective Adkins returned to Tennessee, she interviewed the victim for a second time because she wanted to ask him about the camping incident. She said she had never investigated a child sex abuse case where the victim claimed that the perpetrator's penis was soft or semi-erect. She said that she did not give the appellant his statement to read but that he sat beside her on the couch and followed along while she read it.

Jeffrey Michael Parrish testified for the appellant that he was the President of Lakeview Marina and had known the appellant for sixteen years. At the time of trial, the appellant had worked for Parrish as a marine mechanic for five months. Parrish said the appellant was very dependable and told him about the charges. Parrish said that he had two daughters, ages seven and three, and that the appellant had been with his children alone. He said he trusted the appellant with his children.

On cross-examination, Parrish testified that the appellant had been alone with his children at the marina one or two times for fifteen or twenty minutes each time. When asked

if he was aware the appellant had given a statement in this case, he said no. However, he said that even if the appellant admitted the allegations, it would not change his opinion about leaving his children alone with the appellant.

Eileen Hegel, the appellant's mother, testified that she had known the victim since he was about one year old and that the victim, his mother, and the appellant lived with her before the appellant married the victim's mother. The appellant and the victim had a very good relationship and got along very well. She said that the victim called the appellant "daddy" and that he never told her about any abuse. She said the appellant usually disciplined the victim because the victim's mother was "sleeping or reading a book or playing Atari games." In 2002, Eileen Hegel celebrated Christmas at the appellant's apartment. She said the victim had tubes in his ears, could not get his ears wet, and got into the bathtub with the appellant "quite a bit." She stated that the victim spent time at her home and that he lied "like all children do." She said that the victim did not have the same toys as her grandson and that the victim would put her grandson's toys in the victim's pockets. After the appellant and the victim's mother divorced, Eileen Hegel continued to have contact with the victim.

Maureen Hegel, the appellant's older sister, testified that she had known the victim since he was a baby and that she had three children, ages twenty-two, eighteen, and twelve. Her youngest child was about the same age as the victim, and they always played together in 2002. She said that the victim sometimes was "a little devious" and that he lied often. When he came to her house, she would have to search him before he left because he would steal her son's toys. She said she also had to discipline him for misbehaving. The victim sometimes spent the night at Maureen Hegel's home. She said that he wanted to go outside and play at 2:00 or 3:00 a.m. and that he would "blast" the stereo at 4:00 a.m., waking her family. She said the victim did not have nightmares or wake up screaming. The victim would take a bath with the appellant when they lived at her mother's home. After the appellant and the victim's mother divorced, the appellant and the victim continued to have a relationship. The victim continued to lie and would lie to get out of trouble. She said that the appellant was around all of her children, that she trusted him with her children, and that her children loved him.

Robert Edward Ratliff, II, testified that the appellant used to work for his moving company and that he had known the appellant for about two years. He said that he had four children, ages seventeen, twelve, ten, and three, and that the appellant had been with his children alone "for a second or two." He said that he never saw the appellant exhibit any inappropriate behavior with his children and that his children thought of the appellant "kind of like an uncle." He said he was aware that the appellant gave a statement in this case and that the appellant was charged with rape of a child.

-10-

On cross-examination, Ratliff testified that "I've never seen him, in — in moving jobs, being around other children, like this, I've never seen anything that would make me think that he would do something like that." However, he acknowledged that people who abused children were likely to do so in private.

The appellant testified that in 2000, he lived in an apartment downstairs in his parent's house. He was dating the victim's mother, who was about to lose her apartment, and invited her and the victim to move in with him. He said that he nicknamed the victim "Moose" and that he treated the victim like his own son. In the winter, the appellant would soak his legs in hot water due to pain caused by pins in his hips. At some point, the victim's mother asked if the victim could get into the bathtub with the appellant in order for the appellant to wash the victim's hair. The appellant said that it became "common practice" for the victim to get into the bathtub with him and that he always covered his groin with a towel when he and the victim were in the tub. In 2002, they moved into an apartment at Cabana Apartments. The appellant said that the victim was four to five years old and that the victim continued to get into the bathtub with him "once in a while." One day in December 2002, the pain in the appellant's legs was unbearable, so the appellant got into the tub to soak. The victim's mother asked if the appellant could wash the victim's hair, and the appellant said yes. The appellant put a towel over his groin. As the victim got into the tub, he knocked part of the towel off the appellant. The appellant explained, "In a laughing voice, [the victim] said, 'Your winky went up my butt.'" The appellant said he told the victim firmly, "No, it did not, and don't you ever say that again."

The appellant testified that in 2003, the family moved to Wilmington, North Carolina. However, at some point, the appellant and the victim's mother separated. The victim and his mother eventually returned to Tennessee. In 2005, the appellant and the victim's mother amicably divorced due to financial problems and personal problems over the appellant's erectile dysfunction. The appellant also had a drinking problem. The appellant saw the victim twice after the divorce. He said that he had never done anything inappropriate with the victim and that his penis was never erect while he was around the victim. On October 19, 2007, he met with Detectives Adkins and Rhoades at the auto garage where he worked as a mechanic. They talked in his boss' office. The appellant explained the incident in the bathtub to Detective Adkins, but she kept insinuating that she did not believe him. She also accused him of putting his finger inside the victim. The appellant told Detective Adkins that during a camping trip, the victim became covered with mud. When they got home, the appellant carried the victim to the shower and scrubbed the mud off him. The appellant said that the victim had heat rash on the victim's backside, that he was "patting around [the victim's] hind end," and that the victim started crying. The victim's mother came into the bathroom to check on the victim and took the victim into his bedroom.

The appellant testified that while he was talking with the detectives, his boss came into the room and said he needed his office back. People also were looking into the office through the glass door. The appellant said he became frustrated and eventually told the detectives, "Okay, whatever." He said he used the word "butt" in the statement because "I know the difference between anus and butt." Detective Adkins read the statement to him, and he did not add anything to the statement because he needed to get back to work. He acknowledged that he signed the statement but said that he "signed it deliberately . . . another way on the last page to show I did not agree [with] what was on it. I was never in trouble before. I had no idea what this was really going to lead to." He said he had never seen the victim have night terrors.

On cross-examination, the appellant testified that he signed a waiver of rights form. He made some corrections to the statement Detective Adkins wrote and initialed them, and Detective Adkins read the statement to him. He said, "And after I heard what was on the statement, I was in disgust." He said that he needed to get back to work and that he signed the statement because he was under a lot of stress. He denied that he put his penis inside the victim or that he was "turned on" while the victim was in the bathtub with him. He said he explained the bathtub incident to Detective Adkins, "but for some reason it never made it to the statement." Regarding the camping incident, he said his finger went inside the victim while he was cleaning the victim with a washcloth. He acknowledged that during his recorded telephone conversation with the victim, he told the victim to stop talking about "that stuff." He said he was referring to the incident in the bathroom where the victim knocked the towel off. He said he also told the victim to "keep that quiet" because "I didn't want an anthill turning into a mountain the way it has now." He said he never penetrated the victim's anus, that Detective Adkins omitted things from his statement, and that she added things to his statement he did not say. He said that he told the detectives he had an attorney and that Detective Rhoades was lying when she said he never mentioned the attorney.

Dr. Roger Archer, an osteopathic physician, testified that he worked as a family physician at Mountain Region Family Medicine. On July 12, 2007, he examined the victim's rectum for bleeding. He saw no sign of bleeding, no source of bleeding, and no evidence of injury. According to Dr. Archer's notes from the victim's examination, he also saw no hemorrhoids, fissures, or scars. He read his notes from the examination to the jury, stating, "No obvious signs of sexual abuse, but this does not rule out sexual abuse."

On cross-examination, Dr. Archer testified that he did not look inside the victim's anus. He acknowledged that the victim's alleged sexual abuse occurred five years prior to the examination and that signs of trauma would not have been present. He also acknowledged that he had heard anal trauma to child sex abuse victims healed within two weeks.

-12-

The State made the following election of offenses, which the trial court instructed to the jury: Count 1, the appellant committed aggravated sexual battery by intentionally touching the victim's intimate parts with his hand in the bathroom at Cabana Apartments; count 2, the appellant committed aggravated sexual battery by the victim's hand touching the appellant's intimate parts in the bathroom at Cabana Apartments; count 3, the appellant committed rape of a child by penetrating the victim's anus with his finger in the bathroom at Cabana Apartments; and count 4, the appellant committed rape of a child by penetrating the victim's anus with his penis in the bathroom at Cabana Apartments. The jury convicted the appellant of rape of a child in count 4 and incest in count 5.

## I. Factual Background

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support the convictions because the evidence established that the victim had a problem with lying and had a motive to lie, having been caught participating in a sexual act with another boy. The appellant argues that the jury's acquitting him of the other charges demonstrates that the jury discredited the victim and convicted him based upon his statement. He argues that because he did not have the opportunity to read his statement and was under stress when he signed it, this court should reverse his convictions. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. See id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

At the time of the offense, Tennessee Code Annotated section 39-13-522(a) (2003)

provided that rape of a child was the "unlawful sexual penetration of a victim by the defendant . . . if such victim is less than thirteen (13) years of age." Sexual penetration "means . . . anal intercourse . . . of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7). A person commits incest when the person "engages in sexual penetration . . . with a person, knowing such person to be, without regard to legitimacy . . . [t]he person's . . . stepchild." Tenn. Code Ann. § 39-15-302(a)(1).

The appellant argues that the evidence is insufficient to support the convictions because the jury obviously disbelieved the victim. He contends that the jury should not have convicted him based upon his statement because he was not allowed to read his statement before he signed it and he gave the statement under stress.[1] However, the defense cross-examined Detective Adkins extensively regarding the circumstances under which the appellant gave the statement. Detective Adkins testified that she wrote the statement for him, that she read the statement to him, and that he made and initialed corrections. She said that she did not write down the appellant's statement verbatim but that he had the opportunity to add anything he wanted to the statement. The appellant chose not to add anything. Although the appellant claimed at trial that he became frustrated and finally told the detectives, "Okay, whatever," the jury chose to believe that the appellant truthfully told the detectives that he anally penetrated the victim with his penis in the bathtub. We note that the appellant's and the victim's telephone conversation strongly suggests that the appellant engaged in inappropriate behavior with the victim and that the appellant tried to persuade the victim not to reveal what occurred. The jury, not this court, determines the credibility of the witnesses and the weight and value to be given their testimony. The jurors, as they were free to do, chose to accredit the evidence presented by the State. The evidence is sufficient to support the convictions.

## B. Jury Voir Dire

The appellant claims that the prosecutor made improper comments during voir dire about the victim's testimony and credibility that may have biased the jury against the appellant. The State argues that the appellant has waived the issue because he failed to request a curative instruction and that, in any event, he has failed to show he was prejudiced by the prosecutor's comments. We agree with the State.

During voir dire, the prosecutor told the potential jurors that the victim was eleven

---

[1]We note that the appellant filed a motion to suppress his statement on the basis that it was involuntary and obtained without the benefit of counsel. A transcript from the suppression hearing is not in the appellate record.

years old and was five at the time of the abuse. The prosecutor asked the jurors if they understood it was going to be difficult for the victim to testify about what happened to him and told them that the victim had been in three mental hospitals. The trial court interrupted, asked that the prosecutor and defense counsel approach the bench, and told the prosecutor, "You need to ask questions. . . . See, you're giving us basically an opening statement." Jury selection resumed, and the prosecutor told the jury the following:

> Now, does everyone understand that it might be embarrassing for an 11-year-old child to discuss a sexual abuse allegation, what happened to him?
>
> Now, [the victim], he's 11 years old now. State's alleging that the abuse happened in 2002, as we just stated a few moments ago. Was not reported until 2007.
>
> Does anyone expect a child to presumably understand . . .

Defense counsel objected, and the trial court sustained the objection. In a bench conference, the trial court told the prosecutor that "you're asking the jury to precommit how they're going to view a witness's testimony before the witness has testified. . . . [T]he jury can't be required to commit to a particular idea." The prosecutor told the trial court that she was not asking the jurors to commit to anything but asking them if they understood the State was "dealing with a child." The trial court told the prosecutor, "Ask questions about their fairness in the case or can they sit on the jury. Because you can't ask them to precommit to how they're going to feel [about] a particular 11-year-old." Jury selection resumed again. Shortly thereafter, the State asked the potential jurors, "Does everyone here today feel like you've got enough experience with children to be able to assess the credibility of the child that's going to testify today?" Defense counsel objected, but the trial court overruled the objection. The appellant contends that he was prejudiced by the prosecutor's comments to the jury, that the trial court should have instructed the jury to disregard the prosecutor's comments, and that the trial court erred by allowing the prosecutor to ask the prospective jurors if they could assess the victim's credibility.

Control of voir dire is within the sound discretion of the trial court and will not be found to be in error unless an appellant shows prejudice. State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993). Our supreme court has ruled that "[t]he ultimate goal of voir dire is to insure that jurors are competent, unbiased, and impartial." State v. Cazes, 875 S.W.2d 253, 262 (Tenn. 1994).

-15-

The appellant argues that the trial court should have instructed the jury to disregard the prosecutor's comments. However, the appellant failed to request a curative instruction. See Tenn. R. App. P. 36(a). Moreover, although the appellant claims that the prosecutor's comments and question about assessing the victim's credibility may have biased the jury, he has failed to demonstrate any prejudice. In our view, the jury's finding the appellant guilty of only two of the five charged offenses demonstrates that it carefully considered the victim's credibility in determining the appellant's guilt. The petitioner is not entitled to relief.

## C. Consecutive Sentencing

The appellant contends that the trial court erred by ordering him to serve his sentences consecutively. The State argues that consecutive sentencing was proper in this case. We agree with the State.

At the sentencing hearing, the victim's mother testified that the appellant raped the victim from the time the victim was four years old until she left the appellant when the victim was eight or nine years old. When the victim was four years old, he was diagnosed with ADHD and oppositional defiant disorder. She said that at some point, she and the appellant held the victim back a year in school because the victim "couldn't keep up." They did not know what was wrong with the victim at that time. The victim was in the fourth or fifth grade when he and his mother returned to Tennessee from North Carolina. After the victim revealed the sexual abuse, he was put into a behavior modification class. As a result of the abuse, he had to receive counseling. At the time of the sentencing hearing, the victim was almost thirteen years old and was still attending counseling sessions two to three times per month.

The victim's mother read a statement to the court in which she said the following: The appellant stole the victim's innocence. The victim became afraid and confused about his sexuality, his body, and "the natural responses that come with puberty." The victim needed constant reassurance about differentiating between right and wrong and had been having night terrors for eight years. From the age of four until the appellant was put in jail, the victim slept "on the floor most of the time in the corner with all [his] blankets and [his] clothes piled on top of [him] like a nest." After the victim revealed the abuse, he was hospitalized twice, once for three months. When the appellant was jailed, the victim began sleeping at night, improved his grades drastically, and stopped having behavior problems.

On cross-examination, the victim's mother testified that the victim was in counseling for ADHD before the family moved to North Carolina and that she thought the victim had a learning disability before he turned four years old. She said that the victim would be in counseling for the rest of his life. Although the victim was in the sixth grade at the time of

-16-

the hearing, his intelligence was at a much lower grade level.

Eileen Hegel, the appellant's mother, testified for the appellant that their family was very close while the appellant was growing up, that she loved him, and that she visited him in jail every weekend. She said she loved the victim and that she was sorry this happened.

The trial court read a letter aloud from Fred Hegel, the appellant's father. According to the letter, the appellant "[probably] drank too much and did not go to church very often" but was not "the type that would hurt children." The appellant was a Boy Scout and was involved with the Big Brothers program. He did not have a criminal record prior to his convictions in this case.

Maureen Hegel, the appellant's sister, testified that the appellant lived with her when he moved back to Tennessee from North Carolina. He worked everyday, sometimes until late at night, and helped his sister around the house. She said that he had helped her with her children over the years, that she trusted him, and that her son was "dying" without him. She said the appellant was not guilty of the crimes.

The trial court noted that as a Range I, standard offender, the appellant was facing a sentence of fifteen to twenty-five years for the child rape conviction, a Class A felony, and three to six years for the incest conviction, a Class C felony. See Tenn. Code Ann. § 40-35-112(a)(1), (3). The court also noted that according to the appellant's presentence report, he graduated from high school, served in the United States Navy, was honorably discharged, and attended the Marine Academy of Science and Technology where he became certified as a Mechanical Engineer. Prior to the trial in this case, the appellant had no other convictions. However, he was subsequently convicted of driving under the influence, misdemeanor possession of marijuana, and possession of drug paraphernalia.

The trial court noted that the events leading to the appellant's prosecution occurred before the 2005 amendments to the Sentencing Act took effect but that his trial and sentencing occurred after the effective date. The appellant did not sign a waiver allowing him to be sentenced under the 2005 amended version. Therefore, the trial court refused to apply any enhancing factors. See Blakely v. Washington, 542 U.S. 296, 303 (2004). The presumptive sentence for the child rape conviction was twenty years, the mid-point in the range. See Tenn. Code Ann. §§ 40-35-112(a)(1), 40-35-210(c) (2003). However, the trial court found that the appellant's work history, education, military service, and volunteer work mitigated the sentence to nineteen years. See Tenn. Code Ann. § 40-35-113(13). For the incest conviction, the trial court sentenced the appellant to three years, the minimum punishment in the range. See Tenn. Code Ann. § 40-35-112(a)(3). The trial court ordered that the appellant serve the sentences consecutively. The appellant challenges that ruling.

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-103(5), -210(b); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

"Whether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). In this case, the trial court imposed consecutive sentencing pursuant to Tennessee Code Annotated section 40-35-115(b)(5), which provides as follows:

> The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

In ordering consecutive sentencing, the trial court stated,

> And particularly the Court's relying on the residual physical and mental damage to the victim. In that regard I'm considering the evidence of the mother that was offered yesterday telling about the treatments the Defendant — the child had gone through, commitments, and other things. And I believe also the child testified at trial and expressed some of the concerns he had, at jury trial. And all other facts pertinent to that issue.

-18-

The appellant was the victim's stepfather and served as a father figure to him. Regarding the nature and scope of the sexual contact, the appellant admitted in his statement that he anally raped the victim with his penis in the bathtub. We agree with the trial court that the residual mental damage to the victim was great. At trial, the victim testified that he had night terrors and that "I can't control it." The victim's mother also testified at trial that the victim had night terrors and that the victim did not start acting out and lying until he revealed the abuse when he was nine or ten years old. At the sentencing hearing, she testified that the victim was confused about his sexuality, his body, and responses caused by puberty. She said that the victim received treatment in two mental hospitals after he revealed the abuse, spending three months in one hospital; that he had to undergo counseling as a result of the abuse; and that he would need counseling for life. We conclude that the trial court did not abuse its discretion by ordering consecutive sentencing.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE